# In the United States Court of Federal Claims

No. 12-303C

(Filed:  March 15, 2019)

```
*********************************   )
                                    )
HITKANSUT LLC, et al.,              )      Patent case; motion for award of
                                    )      attorneys' fees and expenses pursuant to 28
            Plaintiffs,             )      U.S.C. § 1498(a); prevailing plaintiffs;
                                    )      jurisdiction; standing; patent owners' fee
      v.                            )      agreements with counsel; findings
                                    )      regarding justification for the
UNITED STATES,                      )      government's position; reasonable
                                    )      attorneys' fees, expense of expert
            Defendant.              )      witnesses, and costs
                                    )
*********************************   )
```

John S. Artz, Dickinson Wright, PLLC, Troy, Michigan, for plaintiffs.  With him on the briefs were John A. Artz and Franklin M. Smith, Dickinson Wright, PLLC, Troy, Michigan.

Gary L. Hausken, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the brief was Joseph H. Hunt, Assistant Attorney General, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Senior Judge.

Plaintiffs Hitkansut LLC and Acceledyne Technologies, Ltd. LLC (collectively, "Hitkansut") brought suit against the United States (the "government") for patent infringement. After a lengthy litigation culminating in a post-trial decision, Hitkansut prevailed on the merits and the court awarded it $200,000 plus interest as reasonable and entire compensation for the infringement.  *See Hitkansut LLC v. United States*, 130 Fed. Cl. 353, 391-95 (2017), *aff'd*, 721 Fed. Appx. 992 (Fed. Cir. 2018).  The judgment was affirmed on appeal.  721 Fed. Appx. 992.[1] Hitkansut now has moved for an award of approximately $4.51 million in attorneys' fees and expenses pursuant to 28 U.S.C. § 1498(a).

The government opposes an award.  It (1) challenges this court's jurisdiction to award attorneys' fees and costs separate from the underlying judgment for compensation, (2) contends that the statute requires the request for fees and costs to be made by the patent owners, but this request is in actuality being made by the owners' attorneys, (3) maintains that its position in the

---

[1]The judgment has not yet been paid, see Hr'g Tr. 68:3-7 (Feb. 15, 2019), and interest is still running.

litigation was substantially justified and, (4) to the extent that Hitkansut merits award, urges that Hitkansut's request is unreasonable and must be reduced.

The court concludes that it has jurisdiction to consider Hitkansut's motion for fees and costs and also finds (1) that the fee request has been properly made by Hitkansut, (2) that Hitkansut is eligible for an award of attorneys' fees and costs as a prevailing plaintiff that meets the statutory size criteria, and (3) that the government's position was not substantially justified. The court further finds that Hitkansut's request is generally reasonable, but must be reduced to elide some inappropriate and unallowable costs and excessive attorneys' fees. Accordingly, Hitkansut's request for expenses and attorneys' fees is granted in part and denied in part.

## BACKGROUND

### A. Infringement of Hitkansut's Patent

Hitkansut owns a patent, United States Patent No. 7,175,722 ("the '722 patent"), that "describes a method of 'changing physical properties of a structure using concurrent application of multiple energy types . . . and methodologies for determining operational settings . . . .'" *Hitkansut*, 130 Fed. Cl. at 360-61 (quoting the '722 patent). While the patent application was pending, in October 2003, Hitkansut entered into a three-year non-disclosure agreement with Oak Ridge National Laboratory ("Oak Ridge") and in accord with that agreement provided a copy of the then-unpublished patent application to senior staff at Oak Ridge. *Id*. at 363. Some of the research staff at Oak Ridge had been experimenting with a materials processing method that involved treatment of metallic parts or materials through application of a high-strength magnetic field. *See id*. at 364. After the disclosure by Hitkansut, however, the researchers at Oak Ridge shifted to experiments involving "*concurrent* application of two energies, induction heating and a high magnetic field." *Id*. (emphasis in original).

Between March 2004 and March 2006, researchers at Oak Ridge applied for "multiple patents for a materials processing method . . . termed thermomagnetic processing." *Hitkansut*, 130 Fed. Cl. at 364-66. The court found that Oak Ridge "prepared various research reports, received funding, authored multiple publications, and received awards" for its thermomagnetic processing research, which was based upon unauthorized use of the '722 patent. *Id*. at 366. Hitkansut's suit alleged that certain of the '722 patent's claims were infringed by Oak Ridge's thermomagnetic processing. *Id*. at 367. The court agreed, upholding the validity of the '722 patent and finding that Oak Ridge's thermomagnetic processing infringed three claims of the '722 patent. *Id*. at 371-90.

The court awarded Hitkansut $200,000 as an up-front licensing fee plus interest dating from February 2007, the date the '722 patent was issued. *Hitkansut*, 130 Fed. Cl. at 391-94. Hitkansut had also sought a royalty of $4.5 to $5.6 million based upon Oak Ridge's having received $45 million in private and public research funding for thermomagnetic processing. *Id*. at 392. But because all monetary benefit to Oak Ridge had resulted from research funding and not from commercialization, the court found royalties to be inappropriate. *Id*. at 392-94.

The court ordered final judgment to be entered with respect to "reasonable and entire compensation for infringement," *i.e.*, $200,000 plus interest, invoking Rule 54(b) of the Rules of

the Court of Federal Claims ("RCFC"), and permitting Hitkansut "[i]n due course, [to] apply for an award of reasonable costs and reasonable fees for expert witnesses and attorneys under 28 U.S.C. § 1498(a)." *Hitkansut*, 130 Fed. Cl. at 395.[2]  The court deferred such an application for fees and expenses "until after any appellate process has been concluded or, alternatively, after the time for taking an appeal has expired." *Id.* At the parties' request, the court clarified the time for requesting attorneys' fees and costs by stating that pursuant to RCFC 54(d)(2)(B), any motion for fees and expenses had to be filed within 30 days of the conclusion of the appellate process or when the time for taking an appeal expired. Order of February 28, 2017, ECF No. 236.

Both parties appealed the judgment. On May 9, 2018, the Court of Appeals for the Federal Circuit affirmed this court's decision, *Hitkansut*, 721 Fed. Appx. at 992, and the formal mandate affirming this court's decision was issued on August 3, 2018, *see* Mandate, ECF No. 241. Neither party petitioned the Supreme Court for certiorari, *see* Hr'g Tr. at 3:22 to 4:1, 4:12-18 (Sept. 24, 2018), and Hitkansut filed its motion for fees and costs on October 24, 2018, Pls.' Req. for Costs & Att'ys' Fees Pursuant to 28 U.S.C. § 1498(a) ("Pls.' Mot."), ECF No. 243.

Hitkansut's motion for fees and costs included documentation to substantiate its request in the form of a declaration by Hitkansut's lead counsel attesting to the reasonableness and accuracy of the request and itemizing expenses. Pls.' Mot. at 3; *see also id.* Attach A (Decl. of John S. Artz in Support of [Pls.' Mot.] ("Artz Decl.")).  The declaration consists of 18 exhibits ("PX") that provide professional information for the three primary attorneys representing Hitkansut (PXs A-C), economic surveys conducted by the American Intellectual Property Law Association ("AIPLA") that showed attorneys' fees in intellectual property litigation by area of the country for 2013, 2015, and 2017 (PXs D-F), a summary and itemization of fees and expenses (PXs G-N, R), and excepts from the trial transcripts and several interrogatory answers provided by the government (PXs O-Q).[3]  The government responded in opposition on January

---

[2]Rule 54(b) provides:

> (b) **Judgment on Multiple Claims or Involving Multiple Parties**. When an action presents more than one claim for relief—whether as a claim, counterclaim, or third-party claim—or when multiple parties are involved, *the court may direct entry or a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay*. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

RCFC 54(b) (emphasis added).

[3]Hitkansut's exhibits will be referred to as "PX __ at A___," reflecting the exhibit number followed by the page number.

2, 2019, and included an appendix with 10 exhibits, two of which consisted of the attorneys' retention agreements with Hitkansut, while the remaining eight contained resumes for attorneys who appear in Hitkansut's attorneys' fee request. Resp. of the United States to Hitkansut's Appl. for Fees & Costs ("Def.'s Resp."), ECF No. 248.[4] Following receipt of Hitkansut's reply on January 30, 2019, Pls.' Reply in Support of its Appl. for Fees & Costs ("Pls.' Reply"), ECF No. 251, the court held a hearing on February 15, 2019.

## B. Costs and Fees Requested Pursuant to 28 U.S.C. § 1498(a)

Hitkansut seeks $4,507,062.56 through August 3, 2018, the end of the appellate process, consisting of: (1) $3,241,353.00 in attorneys' fees; (2) $823,196.92 in expert and consulting expenses; and (3) $442,497.04 in litigation expenses exclusive of expert fees. PX H at A042-46 (attorneys' fees); PXs J-L at A050-202 (expert fees); PXs. M-N at A204-320 (expenses).[5] Hitkansut also stated that it seeks its fees and expenses in pursuing this motion, but such fees and expenses were not listed, see Pls.' Mot. at 19-20, nor have they subsequently been provided.

Hitkansut divides its attorneys' fees and expenses into four broad numeric categories representing litigation stages. Category 1 represents pre-trial activities, and runs from the start of representation on January 27, 2011, through February 1, 2016. It is associated with five enumerated attorney tasks: 1 (investigation, pleadings, initial disclosures), 3 (non-summary judgment motions), 4 (discovery), 5 (claim construction), and 6 (motions for summary judgment). See PX H at A042-45. Category 2 represents activities preparing for trial, at trial, and during post-trial proceedings. See id. at A045-46. It runs from February 2, 2016, through January 9, 2017, and is associated with attorney task 8. Category 3 covers activities on appeal. See id. at A046. It runs from January 10, 2017, through August 3, 2018, and is associated with attorney task 9.[6] Category 4 covers post appeal activities, such as pursuing costs and fees, is associated with task 10, and runs from August 4, 2018, until the present. Category 4 is barren.

---

[4]The government's response contains an appendix consisting of 10 undesignated but consecutively paginated exhibits. The government's exhibits will be referred to as "GA __," which reflects the page number of the appendix.

[5]These values have been corrected. Hitkansut's motion contains a summary of costs, see Pls.'s Mot. at 3, and a breakdown of costs by category and expense type, id. at 13-20, but these costs do not match and contain minor typographical errors. Calculation errors also appear in some of the summary tables of the exhibits, see, e.g., PXs G, I, M, and in the itemization of attorneys' fees, see, e.g., PX H at A044 (Smith, Franklin), A045 (Artz, John S.), although the cumulative errors appear to be less than 1% of the total costs sought.

[6]Although Hitkansut states the appellate process ended on May 2, 2018, the Federal Circuit issued its judgment on May 9, 2018. The discrepancy appears immaterial as no costs appear during the seven-day interval. Some expenses are assigned to the period between May 9, 2018, and August 3, 2018, when the mandate issued from the appeals court. The court adopts August 3, 2018, as the end of the appellate process.

| Attorneys' Fees and Costs Claimed by Litigation Stage* (through Aug 3, 2018) | | | | | |
|---|---|---|---|---|---|
| **Litigation Stage** | **Pre-Trial** (Category 1) | **Trial Prep, Trial, & Post Trial** (Category 2) | **Appeal** (Category 3) | **Post Appeal** (Category 4) | **Total Claimed**\*\* |
| **Date Range** | Jan 27, 2011 – Feb 1, 2016 | Feb 2, 2016 – Jan 9, 2017 | Jan 10, 2017 – Aug 3, 2018 | Aug 4, 2018 – Present | |
| **Attorneys' Fees** | $ 1,894,511.00 | $ 1,015,709.00 | $ 331,131.00 | #10 | $ 3,241,351.00 |
| Task ID | # 1, 3, 4, 5, 6 | # 8 | # 9 | | |
| **Expenses – "hard"** (incurred & paid, excluding experts) | $ 53,891.99 | $ 132,028.67 | $ 24,666.61 | | $ 210,587.27 |
| **Expenses – "soft"** (internal to firm) | $ 92,077.96 | $ 82,167.51 | $ 57,664.30 | | $ 231,909.77 |
| **Expert / Consulting Dr. Cahill** | $ 28,584.94 | $ 0.00 | $ 0.00 | | $ 28,584.94 |
| **Expert Dr. Wagoner** | $ 263,744.72 | $ 255,670.70 | $ 20,340.00 | | $ 539,755.42 |
| **Expert Mr. Epps** | $ 120,076.23 | $ 134,780.33 | $ 0.00 | | $ 254,856.56 |
| **Total*** | $ 2,452,883.84 | $ 1,620,356.21 | $ 433,801.91 | | $ 4,507,046.96 |
| \* As presented by Hitkansut and corrected for errors. *See* PX H at A042-46 (attorneys' fees); PXs J-L at A050-202 (expert fees); PXs M-N at A204-320 (expenses). \*\* Total excludes category 4 (*i.e.*, costs after Aug 3, 2018). | | | | | |

## STATUTORY AUTHORIZATION: 28 U.S.C. § 1498(a)

Section 1498(a) of Title 28 permits a patent holder to bring suit against the United States for patent infringement. It reads in pertinent part:

> "Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture."

28 U.S.C. § 1498(a).

Prior to 1996, "reasonable and entire compensation" had not been delineated by the statute. *E.g.*, 28 U.S.C. § 1498(a) (1994). Courts had interpreted it to mean "just compensation" as "required by the Fifth Amendment for government takings by eminent domain." H.R. Rep. No. 104-373, at 2 (1995), 1996 U.S.C.C.A.N. 4173, 4174 (citing *Waite v. United States*, 282 U.S. 508, 509 (1931)). The Fifth Amendment, however, does not itself require the United States to pay litigation expenses in eminent domain cases; "such fees and costs can only be authorized

by statute." *Id.* (citing *United States v. Bodcaw Co.*, 440 U.S. 202, 203 (1979)). Although Congress had authorized "legal fees and costs in cases related to the taking of real property [under] the 'Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970,' . . . [n]o such provision exist[ed] [prior to 1996] . . . in the case where the government is found liable for taking a patent." *Id.* (citing the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 ("Uniform Relocation Act"), 42 U.S.C. § 4654). Further, as of 1995 "[n]o [patent] owner ha[d] yet been able to recover any of its litigation costs under the [Equal Access to Justice Act]," H.R. Rep. No. 104-373, at 2, 1996 U.S.C.C.A.N. at 4174, and this court had held in 1993 that the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, did not apply to patent owners suing the government under 28 U.S.C. § 1498(a), *see de Graffenried v. United States*, 29 Fed. Cl. 384, 386-88 (1993).

Endeavoring to "help small business, independent inventors and nonprofit organizations recover the legal costs associated with defending their patents when the [f]ederal government is found liable for taking and using them," Congress amended 28 U.S.C. § 1498(a) in 1996 to define "'reasonable and entire compensation' to include attorney's fees and costs." H.R. Rep. No. 104-373, at 1-2, 6, 1996 U.S.C.C.A.N. at 4174-75, 4178; *see also* Pub. L. No. 108-308, 110 Stat. 3814 (1996) (amending 28 U.S.C. § 1498(a)). Attorneys' fees and costs were made available for patent owners who are either "independent inventor[s], a nonprofit organization, or an entity that had no more than 500 employees at any time during the 5-year period preceding [infringement by the United States]." 28 U.S.C. § 1498(a). While the original proposal in the House of Representatives conditioned attorney's fees and costs solely on finding the government liable, *see* 140 Cong. Rec. 36,190 (1995) (statement of Rep. Moorhead), the bill as enacted after a Senate amendment allowed the government to avoid paying attorney's fees and costs if the court found either that "the position of the United States was substantially justified or that special circumstances make an award unjust," 28 U.S.C. § 1498(a); *see also* 142 Cong. Rec. 27,243 (1996) (statement of Sen. Lott) (proposing amendment to H.R. 632). In its current form, 28 U.S.C. § 1498(a) now provides in pertinent part:

> "Reasonable and entire compensation shall include the owner's reasonable costs, including reasonable fees for expert witnesses and attorneys, in pursuing the action if the owner is an independent inventor, a nonprofit organization, or an entity that had no more than 500 employees at any time during the 5-year period preceding the use or manufacture of the patented invention by or for the United States. Not[]withstanding the preceding sentences, unless the action has been pending for more than 10 years from the time of filing to the time that the owner applies for such costs and fees, reasonable and entire compensation shall not include such costs and fees if the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust."

28 U.S.C. § 1498(a).

## JURISDICTION & STANDING

### A. *Post-Appellate Jurisdiction over the Claim for Attorneys' Fees and Expenses*

In the post-trial opinion, this court directed "judgment pursuant to RCFC 54(b) respecting the reasonable and entire compensation *for infringement*," and allowed Hitkansut to apply for costs and attorneys' fees as allowed by 28 U.S.C. § 1498(a) after the appellate process ended. *Hitkansut*, 130 Fed. Cl. at 395 (emphasis added). The government argues that this court lacks jurisdiction to address Hitkansut's motion because it is impermissible to bifurcate the compensation awarded for infringement and an award of attorneys' fees and costs. Though the government acknowledges that the court may award fees and costs under 28 U.S.C. § 1498(a), it contends that a proper interpretation of the statute "requires that fees be awarded prior to final judgment because the fees and costs are included in the definition of the 'reasonable compensation' to be awarded." Def.'s Resp. at 5. As the government would have it, it has waived its sovereign immunity for the patent owner's fees and costs, but only to the extent such fees and costs are awarded concurrently with compensation for use. In its view, reasonable and entire compensation is a "singular award" that encompasses attorneys' fees and costs, and does not involve discrete claims or issues. *Id*. at 5. The government avers that once Hitkansut appealed this court's judgment, it "effectively waived any claim for fees *as part of that judgment*." *Id*. at 6 (emphasis in original).

Hitkansut responds that well-settled case law permits the court to award attorneys' fees and costs after resolution of the appeal. Pls.' Reply at 4, 6. Hitkansut invokes RCFC 54, arguing that the rule both "expressly permits the [c]ourt to separate claims where there is just reason to do so" and "contemplates a motion for attorneys' fees and costs being filed after the substantive legal issues have been decided." *Id*. at 4-5 (citing RCFC 54(d)(2)(A)) (emphasis removed).[7] RCFC 54 so provides, and the question presented is whether the statute explicitly mandates a contrary result.

Whether the court may act under 28 U.S.C. § 1498(a) to first award compensation for the government's unauthorized use and then award the owner's costs in pursuing successfully an infringement action presents an issue of first impression for the court. The statute provides that "[r]easonable and entire compensation shall include the owner's reasonable costs, including reasonable fees for expert witnesses and attorneys, in pursuing the action . . . [unless] the court finds that the position of the United States was substantially justified . . . ." 28 U.S.C. § 1498(a).[8] Under this court's rules, "[w]hen an action presents more than one claim for relief . . . the court may direct entry of final judgment as to one or more, but fewer than all, claims or

---

[7]Hitkansut also argues that the government expressly agreed to bifurcation. Pls.' Reply at 5. While perhaps true, neither subject-matter jurisdiction nor sovereign immunity may be waived by consent of the parties. *See*, *e.g.*, *United States v. Cotton*, 535 U.S. 625, 630 (2002) ("Subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.").

[8]28 U.S.C. § 1498(a) also requires that the patent owner be either "an independent inventor, a nonprofit organization, or an entity that had no more than 500 employees at any time during the 5-year period preceding [the infringement]." That Hitkansut meets this requirement is undisputed.

parties only if the court expressly determines that there is no just reason for delay." RCFC 54(b).[9]

The infringement claim and the claim for attorneys' fees and costs in this case constitute distinct claims. The second is necessarily dependent on final disposition of the first. Subsequent litigation regarding attorneys' fees and expenses cannot alter a judgment finding compensation for infringement, as this case evidences. Deferral of attorneys' fees and expenses does not preclude appellate review of the underlying decision regarding infringement. To adopt the government's position would require the court to read into the term "reasonable and entire compensation" an intent to inseparably merge two distinct claims. But such an intent cannot be found. Neither the text of the statute, nor the legislative history of the 1996 amendment to Section 1498(a), nor common practice endorsed by the Supreme Court and the Federal Circuit regarding comparable fee-shifting statutes, requires such a result.

The statutory text does not expressly prohibit recognition of separate claims. 28 U.S.C. § 1498(a). The merger of the parts of the award into a single claim must then arise by implication, from the language that "reasonable and entire compensation shall include the owner's reasonable costs." That "reasonable and entire compensation" includes fees and costs speaks to the amount owed and to what is compensable. It does not speak to timing. It does not imply that two distinct evidentiary showings, one of which must proceed from, and is dependent upon, the other, ought to be treated as one claim. The natural reading of the statute, that the court must award attorneys' fees and costs if the patent owner meets certain enumerated conditions, has factual premises largely divorced from proofs of infringement.

The Uniform Relocation Act provides a useful parallel. It authorizes a court to award attorneys' fees and costs to a private plaintiff "in a proceeding" that grants compensation for the government's taking of property "as a part of such judgment or settlement." 42 U.S.C. § 4654(c). Similarly to 28 U.S.C. § 1498(a), the Uniform Relocation Act provides compensation for a takings claim under the Fifth Amendment. Courts have routinely awarded prevailing plaintiffs attorneys' fees and costs under the Uniform Relocation Act separate from final judgments regarding damages. *E.g.*, *Arkansas Game & Fish Comm'n v. United States*, 87 Fed. Cl. 594, 647 (2009) (issuing judgment on compensation for a taking under RCFC 54(b), and allowing plaintiff to apply for attorneys' fees and costs after conclusion of the appellate process), *rev'd*, 637 F.3d 1366 (Fed. Cir. 2011), *rev'd* and *remanded*, 568 U.S. 23 (2012), *aff'd on*

---

[9]RCFC 54 also contemplates award of attorneys' fees to be made by separate motion "unless the substantive law requires those fees to be proved at trial as an element of damages." RCFC 54 (d)(2). Section 1498(a) does not require that attorneys' fees and expenses constitute a element of infringement. Instead, fees and expenses follow, and depend upon, a finding of infringement and may be awarded to patent holders of Hitkansut's size unless the United States shows that its position was "substantially justified." *See* 28 U.S.C. § 1498(a); *Wright v. United States*, 56 Fed. Cl. 350, 352 (2003) ("The government bears the burden [under 28 U.S.C. § 1498] of demonstrating that its position was substantially justified.") (citing *Doty v. United States*, 71 F.3d 384, 385 (Fed. Cir. 1995) (construing "substantially justified" in the context of EAJA)).

*remand*, 736 F.3d 1364, 1367 (Fed. Cir. 2013).[10] Awards of attorneys' fees and costs under RCFC 54(b) in takings cases under the Uniform Relocation Act have occurred after proceedings that, for example, spanned several trials and appeals, and ultimate briefing of fee and cost claims. *E.g.*, *Otay Mesa Prop. L.P. v. United States*, 124 Fed. Cl. 141, 148-49, 151-52 (2015), *appeal dismissed*, Nos. 16-1438, 1478 (Fed. Cir. Mar. 21, 2016). The fee proceedings were dependent upon the outcome of the litigation. *See Otay Mesa Prop., L.P. v. United States*, 111 Fed. Cl. 422 (2013), *aff'd in part*, *vacated in part*, and *remanded*, 779 F.3d 1315 (Fed. Cir. 2015), on *remand*, 125 Fed. Cl. 141 (2015); 127 Fed. Cl. 146 (2016).

Precedential common practice under similar fee-shifting statute further cuts against the government's proposed interpretation. EAJA cites "any civil action" when discussing fees and costs, language "without any reference to separate parts of the litigation, such as discovery requests, fees, or appeals," and contemplates that "a fee award presumptively encompasses all aspects of the civil action." *Commissioner, I.N.S. v. Jean*, 496 U.S. 154, 158, 161, 166 (1990). Obviously, fees and costs expended pursuing appeals cannot be awarded contemporaneously with final judgment on the underlying claim. But since these subsequent litigation costs are allowable under EAJA, it must be permissible to award attorneys' fees and costs subsequent to, and therefore separate from, a final award of damages. *Jean* implicitly endorses this practice, because the district court decided the merits in 1982 and awarded attorneys' fees and costs in 1986, which award included expenses incurred on appeal and preparing the application for fees and costs. *Jean*, 496 U.S. 154 (1990), *aff'g sub nom. Jean v. Nelson*, 863 F.2d 759, 763-65 (11th Cir. 1988) (discussing case history), *aff'g sub nom. Louis v. Nelson*, 646 F. Supp. 1300 (S.D. Fla. 1986) (awarding attorneys' fees and costs).

The court finds the language of the Uniform Relocation Act and EAJA and the reasoning in *Jean* to be instructive for 28 U.S.C. § 1498(a). Bolstering this conclusion is that both statues are cited in the legislative history of 1996 amendment to 28 U.S.C. § 1498(a) that added the provisions for attorneys' fees and expenses. *See* H.R. Rep. No. 104-373, at 2, 1996 U.S.C.C.A.N. at 4174-75. Under 28 U.S.C. § 1498(a), the patent holder may be compensated for costs "in pursuing the action," 28 U.S.C. § 1498(a), referring to a single "action," as do the Uniform Relocation Act and EAJA. And similar to awarding costs and fees in those statutes, the comparable language of 28 U.S.C. § 1498(a) indicates that the court may award fees and costs for the entirety of the single action, to include expenses incurred on appeal and preparing the application for fees and costs. But such an ability would be meaningless unless the court could defer determining costs and fees until after the appellate process concluded. *See also Jean*, 496

---

[10]Neither the Federal Circuit's initial reversal of the trial court, nor the Supreme Court's reversal of the Federal Circuit, nor the Federal Circuit's ultimate affirmance of the original decision on remand took issue with issuing a final judgment respecting compensation separate from any award of attorneys' fees and costs. *See Arkansas Game & Fish*, 637 F.3d 1366, *rev'd*, 568 U.S. 23; *aff'd on remand*, 637 F.3d 1364. The decision and judgment for compensation was entered on July 1, 2009. In due course, plaintiff applied for fees and costs in April 2014, which were awarded pursuant to a settlement agreement. *See* Order of Final Judgment, *Arkansas Game & Fish Comm'n v. United States*, No. 05-381L (Fed. Cl. Sept. 24, 2014), ECF No. 182.

U.S. at 161-62 ("EAJA – *like other fee-shifting statutes* – favors treating a case as an inclusive whole.") (citing *Sullivan v. Hudson*, 490 U.S. 877, 888 (1989)) (emphasis added).

The legislative history also evinces an intent to expand compensation to assist certain patent owners in bringing potentially viable claims against the government. *See* H.R. Rep. No. 104-373, at 1-2, 1996 U.S.C.C.A.N. at 4173-74. The government's attempt to impose a timing constraint would have the opposite effect. Indeed, the government's approach would not only limit when litigation expenses could be requested, but would complicate proceedings before a final judgment regarding infringement could be entered. But, courts have repeatedly held expenses during appeal and in applying for fees as properly compensable under other comparable fee-shifting statutes. *E.g., Jean*, 496 U.S. 154. The government points to no evidence Congress intended a different result under 28 U.S.C. § 1498(a).[11]

In this case also, the Federal Circuit affirmed the underlying decision in its entirety under Fed. Cir. R. 36, which decision had included a plain statement deferring attorneys' fees and costs until the appellate process concluded. *See* 721 Fed. Appx. 992, *aff'g* 130 Fed. Cl. 353, 395.

In sum, the court finds nothing within the text of 28 U.S.C. § 1498(a), appearing either expressly or arising inferentially from a natural reading, or among interpretations of similar statutes, that deprives this court of the ability to make an award of fees and expenses separate from an award of compensation regarding infringement. Accordingly, this court concludes that it retains jurisdiction under the statute to adjudicate Hitkansut's motion for fees and costs.

### B.   Standing—Real Party in Interest

The government also argues that the court cannot award attorneys' fees and expenses because 28 U.S.C. § 1498(a) "limits recovery to fees incurred by the owner," and it further contends that the nature of the fee arrangements between Hitkansut and its attorneys means Hitkansut neither incurred any fees nor would "benefit[] from the fee award." Def.'s Resp. at 3 (emphasis removed). In effect, the government argues that the attorneys are the real party in interest: "Dickinson [Wright] has sole control over the request for costs and fees . . . and is entitled to the entire award." *Id.* at 2. Hitkansut defends the fee arrangement in the retention agreements, arguing that it retains ownership rights in the '722 patent despite the fee

---

[11]Ironically, adopting the government's position would entail a different type of bifurcation of reasonable fees and costs. Instead of dividing reasonable costs into its constituent parts, reasonable costs would be divided by litigation stage. Before the trial court, plaintiffs would seek damages and attorneys' fees and costs through judgment. But since all costs through the fee application are properly recoverable, *e.g., Jean*, 496 U.S. 156, 161-62, plaintiffs would then seek additional reasonable costs before the appellate court consisting of attorneys' fees and costs during appeal, and perhaps again before the Supreme Court, and perhaps again after success upon remand, and so on. This scenario could "spawn a 'Kafkaesque judicial nightmare' of infinite litigation to recover fees for the last round of litigation," against which the Supreme Court has cautioned. *Id.* at 163 (citations omitted).

arrangement.  Pls.' Reply at 2-3.[12]  Further, Hitkansut notes that it is entitled to the recovery after reimbursing its attorneys for costs and some fees, and thus the greater the award, the greater the recovery that flows to Hitkansut.  *Id.* at 3.  At issue then, is what properly constitutes Hitkansut's costs under an arrangement where Hitkansut's obligation to pay depends on the size of the recovery and is, to some extent, disconnected from the actual value of the work performed by its attorneys.

Hitkansut executed two retention agreements with Dickinson Wright.  Under the first agreement, Dickinson Wright agreed to represent Hitkansut regarding Oak Ridge's alleged infringement of the '722 patent on a contingency basis where Dickinson Wright would obtain 50% of the net recovery after reimbursement for expenses.  GA 1-3.  In the event Hitkansut did not prevail, Hitkansut would have no liability for any expenses or fees incurred by Dickinson Wright.  GA 1, 3.  Hitkansut executed a second fee agreement with Dickinson Wright in March 2017 that covered the appeal.  GA 5.  By its explicit terms, the second agreement did not affect the first agreement, but it did delineate how an ultimate recovery would be disbursed that covered all stages of the litigation.  GA 6.  Hitkansut agreed to pay Dickinson Wright for all expenses and attorneys' fees incurred in handling the appeal, with attorneys' fees to be determined based upon Dickinson Wright's standard hourly rate, although the appellate costs would be paid from any recovery.  GA 6.  The agreement also gave Dickinson Wright the "right to pursue reimbursement of attorneys' fees and expenses with either [this court or the appellate court]" and specified that Dickinson Wright was "solely entitled to any award of fees and expenses."  GA 6.  Dickinson Wright's receipt of any attorneys' fees awarded to Hitkansut would not affect Dickinson Wright's entitlement to its contingency fee.  GA 7.

In sum, Hitkansut would have no financial obligation to Dickinson Wright in the event of no recovery.  GA 1, 3, 6.  But if Hitkansut did recover—as it has—its recovery would be distributed in the following order: first, Dickinson Wright would receive payment for expenses but not attorneys' fees incurred in the original litigation prior to appeal; next, from any remaining recovery, Dickinson Wright would receive expenses and attorneys' fees incurred pursuing the appeal; and finally, Dickinson Wright and Hitkansut would split evenly any remaining recovery, pursuant to their contingency agreement.  GA 1, 3, 6-7.  In short, Hitkansut's share of the recovery, assuming the reasonableness of Dickinson Wright's expenses, would vary based on whether this court awards attorneys' fees and costs.

Contrary to the government's argument, an award of pre-appeal expenses aside from attorneys' fees and all appellate fees and expenses would affect the size of Hitkansut's recovery. As circumstances played out, so long as the court awarded at least approximately $1.35 million towards expenses and appellate attorneys' fees, there would be a positive recovery for Hitkansut.[13]  Hitkansut only recovers if awarded these fees and expenses.  Because Hitkansut is

---

[12]The court concurs that Hitkansut's representation agreements did not transfer ownership of the '722 patent, but does not interpret the government's contention as raising an argument to the contrary.

[13]Attorneys' fees during appeal and total expenses are approximately $1.6 million.  An award of at least $1.35 million would have less than $250,000 in remaining costs.  Hitkansut's

legally obligated to pay these costs before it receives any of the award, it has incurred these costs and it is thus proper for Hitkansut to seek them.

What remains, then, is the approximately $2.9 million in pre-appeal attorneys' fees. While this court has not previously construed what constitutes "the owner's . . . costs" under 28 U.S.C. § 1498(a), interpretation of other fee-shifting statutes indicates that the contingency arrangement should not bar recovery of Hitkansut's pre-appeal attorneys' fees. The Court of Appeals for the Federal Circuit has found that "[g]enerally, 'awards of attorneys' fees where otherwise authorized are not obviated by the fact that individual plaintiffs are not obligated to compensate their counsel [because] an attorney-client relationship suffices to entitle prevailing litigants to receive fee awards.'" *Ed A. Wilson, Inc. v. General Servs. Admin.*, 126 F.3d 1406, 1409 (Fed. Cir. 1997) (quoting *Rodriguez v. Taylor*, 569 F.2d 1231, 1245 (3d Cir. 1977)). Construction of three other fee-shifting statutes frequently at issue in the Federal Circuit indicates that attorneys' fees under 28 U.S.C. § 1498(a) should be recoverable notwithstanding a contingency arrangement.

The Back Pay Act provides that a government employee who is wrongfully deprived pay "is entitled, on correction of the personnel action, to receive . . . reasonable attorney fees . . . [that] shall be awarded in accordance with the standards established under § 7701(g) of this title." 5 U.S.C. § 5596(b)(1)(A). Section 7701(g), in turn, requires, among other things, that the fees awarded be "incurred" by the employee, 5 U.S.C. § 7701(g)(1), or be awarded "as part of the costs," 42 U.S.C. § 2000e-5 (cited by 5 U.S.C. § 7701(g)(2)). In approving an award of attorneys' fees to a legal services organization at market rates that exceeded actual cost, the Federal Circuit held that to:

> restrict 'reasonable attorney fees incurred' to 'reasonable attorney fees *actually* incurred' constitutes precisely the type of legislative rewrite that any court should avoid. It imposes a limitation which Congress neither expressed nor intended. Congress has passed a variety of statutes that have specifically referred to attorney fees as 'incurred,' *see, e.g.,* 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act ("FOIA")); 5 U.S.C. § 552a(g) (Privacy Act of 1974); Fed. R. Civ. P. 37(a)(4), but the courts have neither interpreted the 'incurred' term in these statutes to restrict or limit the payment of fees to those *actually* incurred, nor prevented market-rate fees from being awarded.

*Raney v. Federal Bureau of Prisons*, 222 F.3d 927, 934 (Fed. Cir. 2000) (emphasis in original).

Similarly, EAJA permits a court to "award reasonable fees and expenses of attorneys" and "fees and expenses . . . *incurred* by that party . . . ." 28 U.S.C. § 2412(b), (d)(1)(A) (emphasis added). The Federal Circuit held in *Ed A. Wilson, Inc.* that the plaintiff "incurred" attorneys' fees under EAJA despite its "insurer being responsible for paying them." 126 F.3d at 1408-10. The court continued, "[i]t is well-settled that an award of attorney fees is not

---

award with interest is currently worth at least $400,000, leaving a recovery to split once remaining costs are paid.

necessarily contingent upon an obligation to pay counsel. Generally, awards of attorneys' fees where otherwise authorized are not obviated by the fact that individual plaintiffs are not obligated to compensate their counsel." *Id.* at 1409. As the court had reasoned in an earlier case, "any fee award is made to the 'prevailing party,' not the attorney [and thus the attorney cannot] directly claim or be entitled to the award . . . . In this sense, [a plaintiff who must turn over any fee award to the attorney per their agreement] incurs the attorney fees that may be awarded." *Phillips v. General Servs. Admin.*, 924 F.2d 1577, 1582 (Fed. Cir. 1991).

In contrast to EAJA or the Back Pay Act, the attorneys' fees provision of the Uniform Relocation Act requires the court to "reimburse [the] plaintiff for his reasonable costs, disbursements, and expenses . . . actually incurred because of such proceeding." 42 U.S.C. § 4654(c). In *Washington Metro. Area Transit Auth. v. United States*, 57 Fed. Cl. 148, 152-53 (2003), this court held that the use of "reimburse" and "actually incurred" in the Uniform Relocation Act distinguished that statute from the Back Pay Act as interpreted by the Federal Circuit in *Raney*. Accordingly, the court restricted attorneys' fees to those actually incurred by the plaintiff. *Id.* This court has applied similar reasoning in other cases under the Uniform Relocation Act. *E.g.*, *Lost Tree Vill. Corp. v. United States*, 135 Fed. Cl. 92, 98-99 (2017) (allowing reimbursement of fees actually paid by the plaintiff but rejecting a "success fee" that was contractually recoverable only from the "government as part of the reasonable attorney's fees" owed to the plaintiff); *but see Shelden v. United States*, 41 Fed. Cl. 347, 357 (1998) (construing the Uniform Relocation Act to be comparable to EAJA).

The text of 28 U.S.C. § 1498(a) speaks to plaintiff's "costs." Missing are terms like "reimburse" and "actually incurred," which distinguishes Section 1498(a), EAJA, and the Back Pay Act from the Uniform Relocation Act. Parallel language counsels parallel interpretation. Had Hitkansut agreed to pay pre-appeal attorneys' fees based on an hourly rate and from any recovery, as it did for attorneys' fees incurred on appeal, Hitkansut would have actually incurred these costs to the extent of its recovery. The government essentially asks the court to distinguish this possible arrangement with Hitkansut's actual arrangement. But if that was the rule,

> attorneys hired on a straight hourly basis would recover their full fee up to the market rate, but attorneys on retainers, attorneys with contingent fees, and attorneys offering services under prepaid legal plans would recover less. [The Federal Circuit] has not drawn such a distinction under the Equal Access to Justice Act. *See Phillips*, 924 F.2d at 1582 & n. 4. There is no reason to draw such a distinction in cases arising under the attorney fee provisions of the Back Pay Act.

*Raney*, 222 F.3d at 935. Owing to statutory language comparable to the Back Pay Act and EAJA, there is no reason to draw such a distinction in cases arising under the attorneys' fee provision of Section 1498(a).

Accepting the government's argument would also dissuade litigation by the very class of people the fee-shifting provision of 28 U.S.C. § 1498(a) exists to help. The text of the 1996 amendment to Section 1498(a) indicates for whom the benefit is intended: independent inventors, nonprofit organizations, and small businesses. 28 U.S.C. § 1498(a); *see also* H.R. Rep. No. 104-373, at 1, 1996 U.S.C.C.A.N. at 4173. This class is the least likely to be able to

"actually incur" litigation costs, especially when pitted against the resources of the federal government. Depriving these plaintiffs of the ability to seek attorneys' fees if they use a contingency arrangement would hamper them from bringing claims and dissuade attorneys from taking their cases. As the Federal Circuit noted in *Raney* when holding that attorneys' fees were awardable even if not actually incurred, "[w]hen Congress amended the Back Pay Act to provide for fee awards more broadly, it sought to eliminate the strong financial disincentives for those who would protect their employment from unjustified governmental action. In so doing, it sought to deter the unreasonable exercise of governmental authority." 222 F.3d at 935 (citations omitted); *see also Jean*, 496 U.S. at 163 (EAJA exists to "eliminate for the average person the financial disincentive to challenge unreasonable governmental actions."). The same logic applies here.

The cases advanced by the government are manifestly dissimilar, and in part contrary to precedent in this circuit. In *United States v. Paisley*, 957 F.2d 1161 (4th Cir. 1992), five former employees of Boeing who successfully defended themselves in a criminal prosecution sought attorneys' fees under EAJA. Boeing, however, agreed to indemnify them if required by state law. *Id.* at 1163. The Court of Appeals for the Fourth Circuit concluded that the employees did not incur attorneys' fees because they had "a legally enforceable right to full indemnification" by Boeing, "a solvent third party." *Id.* at 1164. Correlatively, in *Securities & Exchange Commission v. Comserv Corp.*, 908 F.2d 1407, 1415 (8th Cir. 1990), a corporate officer was also indemnified by a third party, and the court ruled that the officer was ineligible for an award of fees under EAJA. In doing so, however, the court nonetheless noted that "EAJA awards *should be* available where the burden of attorneys' fees would have deterred the litigation challenging the government's actions." *Id.* at 1415 (emphasis added). And in *Unification Church v. I.N.S.*, 762 F.2d 1077, 1082-83 (D.C. Cir. 1985), a suit where plaintiffs consisted of a church and its members, the church paid the entire litigation expense. The D.C. Circuit ruled that the church was the real party in interest and thus the members were ineligible to make a request for attorneys' fees.[14] The church itself was found to be ineligible for fees because it had more than 500 employees. *Id.* at 1092.

None of these cases rested upon facts comparable to those of Hitkansut's case. In *Paisley*, *Comserv*, and *Unification Church*, attorneys' fees were being paid by a third party. Hitkansut will not be indemnified, unless the court contorts indemnification to mean Hitkansut's attorneys will absorb any costs not awarded. Adopting the government's position based on these cases would preclude award of attorneys' fees under any attorney retention arrangement contingent upon the result. The government's reasoning reaches too far. It would make the attorneys the real party in interest in such circumstances, and the attorneys would not get fully paid, if paid at all, absent an award of fees unless the infringement award was sufficiently sizable. But, this outcome would fundamentally undermine the statute, precluding from bringing suit the very litigants intended to be benefitted by the 1996 statutory amendment. The patent

---

[14]The Federal Circuit and other circuits have questioned the application of the real party in interest doctrine of *Unification Church*. *See, e.g.*, *BASR P'ship v. United States*, 915 F.3d 772, 781-83 (Fed. Cir. 2019).

owners most likely to use contingent arrangements are those with few resources to self-finance their litigation, namely those specifically identified by the statute.

In sum, the court finds that under 28 U.S.C. § 1498(a), the patent owner's costs consist of attorneys' fees that the owner may not be legally obligated to pay, such as those fees contingent on the amount of recovery, when the fees were incurred by the owner's attorney in representation of the owner, or where the owner would be contractually obligated to pay such fees if awarded by the court.

## ANALYSIS

To recover attorneys' fees and expenses under 28 U.S.C. § 1498(a), Hitkansut must first succeed on proving infringement, *i.e.*, be entitled to reasonable and entire compensation, and must have "costs" in "pursuing the action." 28 U.S.C. § 1498(a). This court previously granted judgment in favor of Hitkansut, *Hitkansut*, 130 Fed. Cl. 353, and Hitkansut qualifies under the size limits imposed by the statute. Further, as previously discussed, Hitkansut's request for attorneys' fees and costs constitute "the owner's . . . costs" as required by the statute. Accordingly, Hitkansut is entitled to an award of its costs, to include "fees for expert witnesses and attorneys" if "reasonable . . . in pursuing the action" unless "the position of the United States was substantially justified or [] special circumstances make an award unjust." 28 U.S.C. § 1498(a).

### A. *Was the Government's Position Substantially Justified?*[15]

1. *Interpretation of "substantially justified."*

The government urges the court to import the definition of "substantially justified" from EAJA, along with attendant judicial interpretations of the term. *See* Def.'s Resp. at 6-7, Hitkansut implicitly concurs. *See* Pls.' Mot. at 5, Pls.' Reply at 6-7.

The statute does not define when the government's position is substantially justified. The bill amending 28 U.S.C. § 1498(a) in the House of Representatives was not conditioned upon "the government's litigation position [not being] substantially justified." H.R. Rep. No. 104-373, at 7, 1996 U.S.C.C.A.N. at 4179 (mentioning EAJA and the "substantially justified" standard). The Department of Justice commented that the bill created "a more expansive award" than was available to other claimants against the government. *Id.* The "substantially justified" standard was added later via amendment of the bill by the Senate. *See* 142 Cong. Rec. 27,243 (1996) (proposing the amendment that added the "substantially justified" standard). The Senate's amendment was adopted without discussion, but occurred subsequent to the House's report and addressed the Department of Justice's concerns cited in that report.

Neither the Supreme Court nor the Court of Appeals for the Federal Circuit have interpreted "substantially justified" in the context of 28 U.S.C. § 1498(a). This court, however,

---

[15]The government also argues that special circumstances require denial of the award. The context of their argument in this respect, however, involves the reasonableness of the request and is thus addressed as part of the analysis of reasonableness.

has previously interpreted the term in a manner consistent with its use in EAJA, *see Wright v. United States*, 56 Fed. Cl. 350, 352 (2003), a position supported by the limited legislative history, H.R. Rep. No. 104-373, at 2-3, 7, 1996 U.S.C.C.A.N. at 4174-75, 4179; 142 Cong. Rec. 27,243. The court thus adopts EAJA's interpretation of "substantially justified" for cases proceeding under 28 U.S.C. § 1498(a).

Under EAJA, the government's position is "substantially justified" when it is "justified in substance or in the main – that is, justified to a degree that could satisfy a reasonable person, [which is] no different from the 'reasonable basis both in law and fact' formulation." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted) (citations omitted). The court's inquiry must "focus[] on the governmental misconduct giving rise to the litigation," *Jean*, 496 U.S. at 165, and must examine "the entirety of the government's conduct and make a judgment call whether the government's overall position had a reasonable basis in both law and fact," *Chiu v. United States*, 948 F.2d 711, 715 (Fed. Cir. 1991) (footnotes omitted). "The government bears the burden of demonstrating that its position was substantially justified." *Wright*, 56 Fed. Cl. at 352 (citing *Doty v. United States*, 71 F.3d 384, 385 (Fed. Cir. 1995)).

### 2. *Pre-suit conduct & defining "the position of the United States."*

The government objects to Hitkansut's recitation of the facts of Oak Ridge's pre-litigation conduct as "irrelevant." Def.'s Resp. at 13-14. Despite citing to EAJA to define "substantially justified," the government rejects importation of EAJA's definition of "position of the United States," which would incorporate pre-litigation conduct. *See id.* at 13-14. Instead, it insists that "the position of the United States" under 28 U.S.C. § 1498(a) refers only to "the position [taken] in litigation, not the pre-litigation conduct that led to the suit." *Id.* at 14. Hitkansut argues to the contrary, citing the court's prior adoption of EAJA's definition. Pls.' Reply at 7.

EAJA defines the "position of the United States" as both "the position taken by the United States in the civil action" and "the action or failure to act by the agency upon which the civil action is based." 28 U.S.C. § 2412(d)(2)(D); *see also Jean*, 496 U.S. at 158-59. Unlike EAJA, 28 U.S.C. § 1498(a) does not expressly define "the position of the United States." Strong reasons exist, however, to reject the government's argument and consider the government's conduct holistically, to include its pre-litigation conduct, when evaluating its position.

The text of 28 U.S.C. § 1498(a) refers to a single "position of the United States." The statute makes no distinction between the pre-litigation position and the position taken once litigation commences. There is nothing inherent in the phrase that would confine its scope to only the position taken by the Department of Justice during litigation or only to the position taken by the government after a certain point.

Reference to "the position of the United States" describes what must be "substantially justified." Accordingly, courts have routinely held that reference to the "position of the United States" requires a threshold determination regarding substantial justification encompassing the government's *entire* conduct. *E.g.*, *Jean*, 496 U.S. at 158-60; *Doty*, 71 F.3d at 386. The "substantially justified" standard requires the government's overall position to have a "reasonable basis both in law *and fact*." *Pierce*, 487 U.S. at 565 (emphasis added) (citations

omitted). The government, however, asks the court to strike, or severely circumscribe, "and fact" from that inquiry by ignoring pre-litigation conduct. But pre-litigation conduct is far from irrelevant under the "substantially justified" inquiry. Notably, that inquiry "properly focuses on the governmental misconduct *giving rise* to the litigation." *Jean*, 496 U.S. at 165 (emphasis added).

As a practical matter, the court cannot determine whether the government's position during litigation was justified without examining the underlying facts relating to the government's conduct. A reasonable basis requires more than conceptual arguments germane to the subject matter; arguments must also hue to the facts. That a litigation position may be reasonable in the abstract, *i.e.*, has a reasonable basis in law, does not mean that the litigation position as applied to a specific case remains reasonable when contradicted or unsupported by the factual record. That is as true in infringement litigation under Section 1498(a), as it is in most litigation. The acts of infringement necessarily occur pre-litigation.

Further, the addition of the "substantially justified" qualifier to the amendment to 28 U.S.C. § 1498(a) occurred after the Department of Justice commented to Congress that the attorneys' fees and cost provision as proposed in the House of Representatives expanded the government's liability beyond EAJA due to the absence of the "substantially justified" clause. *See* H.R. Rep. No. 104-373, at 7, 1996 U.S.C.C.A.N. at 4179 (citing the Department of Justice's views) ("There is no sound reason for adopting a different rule in the case of patent claims against the government from the EAJA rule on recovery of costs and attorneys' fees in other claims against the government."). Ensuring that use of the phrase "the position of the United States" in Section 1498(a) aligns closely to EAJA's usage comports with this legislative history. *Compare* 28 U.S.C. § 1498(a) ("Reasonable and entire compensation shall include the owner's reasonable costs . . . [but] shall not include such costs and fees if *the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust*.") (emphasis added), *with* EAJA, 28 U.S.C. § 2412(d)(1)(A) ("[A] court shall award to a prevailing party other than the United States fees and other expenses [and costs] . . . unless *the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust*.") (emphasis added).

Accordingly, the court finds that to evaluate whether "the position of the United States was substantially justified" requires the court to examine all facts surrounding the conduct of the United States that are material to infringement of Hitkansut's patent, regardless of when the conduct occurred.

3. *Whether the government's position was substantially justified.*

Hitkansut challenges whether the government's position was substantially justified by providing examples of actions taken by the government that were found to be without merit. The most prominent example involves Oak Ridge's pre-litigation conduct, where Oak Ridge learned of Hitkansut's invention under a confidentiality agreement and then proceeded to breach the agreement and infringe the invention after discovering the advantages afforded by the invention. Pls.' Mot at 6-8. Further, once litigation commenced, Hitkansut contends that the government "maintained its unreasonable non-infringement positions [contrary to] the claim construction process." *Id.* at 8-9. Hitkansut also asserts that Oak Ridge failed to timely disclose adverse

material information, such as a patent application that describes thermomagnetic processing in terms that contradicted its trial position and the work by another Oak Ridge researcher who spent half of the research funding expended on thermomagnetic processing.  *Id*. at 10-11.  Finally, as Hitkansut would have it, the government asserted positions to invalidate the '722 patent that were contrary to testimony of its own experts.  *Id*. at 10.

The government responds that because its infringing conduct is a "'rightful exercise of the power of eminent domain,' . . . it would be incongruous to hold the Government liable for attorneys' fees based on pre-litigation conduct that was authorized by [the] very statute that grants those fees."  Def.'s Resp. at 14 (quoting *Leesona, Inc. v. United States*, 599 F.2d 958, 967 (Ct. Cl. 1979 (*en banc*)).  In addressing specific instances raised by Hitkansut, the government cites decisions and orders by the court that adopted or accepted its positions and contends that those results demonstrate the reasonableness of its position, irrespective of the ultimate outcome or particular unreasonable stances.  *Id*. at 8-11.  For example, the government cites the court's rejection of four of the seven claims of the '722 patent upon which Hitkansut sued, its bar of discovery into several classified projects, and its denial of a royalty based on research funding, which reduced the government's liability by more than 95%.  *Id*. at 8-11, 22.  Additionally, the government reiterates that specific instances of Oak Ridge's pre-litigation conduct cannot be part of the overall reasonableness landscape.  *Id*. at 13-14.

As a preliminary matter, the court agrees with the government that the government can be found liable for infringement and still advance a substantially justified position.  Holding otherwise would render the "substantially justified" clause superfluous, as infringement is already a prerequisite for reasonable and entire compensation.  28 U.S.C. § 1498(a); *see also Pierce*, 487 U.S. at 569 ("Conceivably, the [g]overnment . . . could take a position that is substantially justified, yet lose."); *ACE Constructors, Inc. v. United States*, 81 Fed. Cl. 161, 165 (2009) (same).  Thus, the relevant inquiry is whether the government has demonstrated that the positions it took during the case, including those taken by Oak Ridge beforehand, were such that a reasonable person could conclude that its position was supportable.  *See Pierce*, 487 U.S. at 565 (Substantially justified means "justified to a degree that could satisfy a reasonable person.").  And that inquiry "properly focuses on the governmental misconduct giving rise to the litigation." *Jean*, 496 U.S. at 165.

Oak Ridge's conduct towards Hitkansut impairs the government's attempt to argue that no infringement occurred or that the patent was invalid.  Government researchers did not merely develop thermomagnetic processing only to discover it infringed upon Hitkansut's patent. Instead, Oak Ridge had for years studied processing of metals in a magnetic field.  *Hitkansut*, 130 Fed. Cl. at 364.  Hitkansut then disclosed to Oak Ridge under a non-disclosure agreement its patent-pending process of applying two energies concurrently to improve the properties of metallic parts.  *Id*. at 363.  Promptly after the disclosure, Oak Ridge shifted its metal-treating research to a process involving the concurrent application of induction heating and a high magnetic field.  *Id*. at 364-65.  Oak Ridge researchers took sole credit for this process, publishing papers and submitting patent applications, *id*. at 365-66, while deciding not to provide additional contracts or funding to Hitkansut, *id*. at 364.  Despite thermomagnetic processing involving "a large oscillatory electromagnetic force," *id*. at 364-65 (quoting one invention disclosure); *see also, e.g.*, Trial Tr. 493:16-19 (May 25, 2016) (deposition of Oak Ridge employee Dr. Wilgen, read into the record at trial), the government represented the opposite, *see e.g.*, PX P at A342-43

(setting out the government's response to Hitkansut's interrogatories). The government also advanced arguments inconsistent with the court's claim construction. *E.g.*, *Hitkansut*, 130 Fed. Cl. at 375, 377, 378. In sum, the government's position that no infringement occurred lacks substantial justification in light of Oak Ridge's decision to substantially alter its research to align with Hitkansut's patented process promptly after learning of that process, then using Hitkansut's process to Oak Ridge's benefit without compensating Hitkansut, and issuing papers and filing patent applications making no reference to Hitkansut's patent.

Oak Ridge attempted to invalidate the '722 patent as covering patent-ineligible subject matter, being obvious, and failing the enablement requirement. *Hitkansut*, 130 Fed. Cl. at 378-79, 382, 389. Raising these issues certainly was legitimate, but the government's specific arguments lacked substantial justification because they were unsupported by the facts. The government failed to demonstrate either of the two parts of the test for patent-eligible subject matter explicated in *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208 (2014). *See Hitkansut*, 130 Fed. Cl. at 378-82 (finding that Hitkansut never attempted to patent an abstract mathematical relationship, while its process, though described mathematically, set out a novel method). Arguments directed towards showing obviousness failed to "address an essential element of each of the three asserted claims" or to "demonstrate any motivation to combine the . . . prior art." *Id.* at 384, 386. The government's witnesses acknowledged that the '722 patent generated "unexpected" results accomplished through an unconventional use of a relationship. *E.g.*, *id.* at 365, 387-88. Further, despite years of prior research in metal processing, Oak Ridge's progress "changed drastically" only after it "copied [the] '722 method." *Id.* at 388. The enablement argument failed because although the '722 patent contained errors, even the government's expert witness conceded that "a person of ordinary skill in the art could account for the errors in the patent without undue experimentation and perform all necessary calculations within approximately one hour." *Id.* at 390. The court also noted that despite arguing invalidity, part of Oak Ridge's infringing conduct involved filing its own patent applications. *Id.* at 365.

The government nonetheless avers that several "reported opinions on the merits [and] unreported opinions on procedural issues" show the reasonableness of the government's positions. Def.'s Resp. at 8. The government overstates the materiality of its success on many of these points.[16] It did prevail in its argument against including research funding in the royalty base, and that result substantially constrained the compensation owed to Hitkansut. This stance likely saved the government more than $3.5 million.[17] But, because the court is to consider the totality of the circumstances in conducting this inquiry, the government's position may not be substantially justified even though it may have taken certain reasonable stances during the dispute. Here, the primary issue was infringement. Consideration of research funding, though important to determination of compensation, was secondary to infringement as a subset of damages. That the government blocked Hitkansut's attempt to expand the government's liability

---

[16]For example, while the government succeeded in invalidating four of the seven contested patent claims, the remaining claims sufficed to establish a basis for the alleged infringement.

[17]This amount is based on the possible application of an 8% royalty rate to the approximately $45 million Oak Ridge received in research fees related to thermomagnetic processing.

by raising an issue of first impression regarding the basis for royalties does not alter whether the government was substantially justified in arguing that no infringement occurred or that the patent was invalid.

## B. *Entitlement to Fees & Costs*

### 1. *Hitkansut's submission of records.*

The government argues that Hitkansut's presentation of attorneys' fees and expenses "does not permit an evaluation." Def.'s Resp. at 33-34. Hitkansut defends its submissions as highly detailed, consisting of both raw data and summaries. Pls.' Reply at 17-18. While 28 U.S.C. § 1498(a) does not specify what a plaintiff must provide to justify their request for fees and costs, the plaintiff ultimately bears the burden of proving the fees owed. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("[T]he fee applicant bears the burden of establishing entitlement to an award."). Accordingly, the plaintiff should present records "in a manner that will enable a reviewing court to identify distinct claims." *See id.* at 437 (EAJA standard).

Hitkansut has provided highly detailed records, including an itemization of all attorney hours and the value of that time, an itemization of all expenses, invoices for all experts, and summary tables. *See, e.g.*, PXs G, H at A039-46. The extensive details may make sorting through each entry a cumbersome process, but such is to be expected given six years of litigation involving more than 12,600 hours. The court was also able to understand the basis of the request despite the extensiveness of the records and the presence of a limited number of mathematical or typographic errors. In its analysis "the court need not engage in a tediously detailed analysis of every hour billed, assigning time to different issues," *Dalles Irrigation Dist. v. United States*, 91 Fed. Cl. 689, 704 (2010), especially where, as in this case, only infringement and compensation were at issue. The court thus finds Hitkansut's submissions sufficient to meet its burden.

One aspect of Hitkansut's submission is flawed, however. Hitkansut has indicated it plans to submit another fee request for its post-appeals work, namely its fee request. Pls.' Mot. at 20. While all reasonably incurred fees are recoverable, *Jean*, 496 U.S. at 156, 161-62, Hitkansut has not timely filed its supplement. The court cannot entertain multiple, successive fee requests. Otherwise, the fee process would be neverending. In effect, Hitkansut has waived the right to seek reimbursement of fees in preparing the fee application because none of those fees or expenses were included in its application or have since been provided. *See Jean*, 496 U.S. at 163 (warning against a "'nightmare' of infinite litigation to recover fees"); *Bratcher v. United States*, 138 Fed. Cl. 543, 547 (2018) (holding that owners prevailing in a taking claim waived right to reimbursement of fees incurred after cut-off date owners used in an initial application).

### 2. *Attorneys' fees.*

Hitkansut's claim for $3,241,351.00 in attorneys' fees represents 12,604.4 hours of work performed as follows: 7,726 hours pre-trial (Category 1) totaling $1,894,511.00; 3,779.2 hours

related to trial (Category 2) totaling $1,105,709.00; and 1,099.2 hours during appeal (Category 3) totaling $331,131.00.  *See* PX H at A041-46.[18]

Thirty-five Dickinson Wright employees were involved with the case, though nine attorneys and one "specialist" account for 97.5% of the fees and nearly 97% of the hours.  *See* PX H.  Hitkansut provided biographical information for the top three attorneys by fees sought: Franklin Smith, John A. Artz, and John S. Artz.  *See* PXs A-C (biographies).  These three represent nearly 75% of the attorneys' fees sought.  *See* PX H.  Franklin Smith is an associate attorney who graduated from law school in 2013 and billed $1,017,797.50 for 4,369.4 hours at hourly rates ranging from $210 to $285, and an average rate of $233.  PXs C, H, R.[19]  John A. Artz is a member of Dickinson Wright with 50 years of legal experience and who practices in the intellectual property field.  PX B.  He billed $916,740.00 for 3,333.6 hours at a consistent hourly rate of $275.  PX R at A602.  John S. Artz is a member of Dickinson Wright with 25 years of legal experience involving intellectual property.  PX A.  He billed $485,605.50 for 1,029.1 hours at hourly rates ranging from $395 to $545, and an average rate of $472.  *See* PX H.  The remaining seven of the top 10 employees were billed at hourly rates ranging from $115 to $280.  *See* PX H.

The government argues that Hitkansut's requested attorneys' fees are excessive.  For John S. Artz, the government contends that some of his hourly rates exceed acceptable lodestars, which should be based on the prevailing mean rates for intellectual property lawyers practicing in the Detroit, Michigan, area and as reflected in the economic surveys conducted by the AIPLA.  Def.'s Mot. at 30-31.  The government argues that Hitkansut's presentation fails to justify certain rates and does not allow for easy evaluation of the rates and hours claimed.  *Id.* at 33-35.  The government also objects to fees involving two previous unsuccessful lawsuits brought in district courts, and the fees incurred on appeal.  *Id.* at 35-37.  The government further contends any fee award must be scaled down significantly due to the court's rejection of including research funding in the royalty base.  *Id.* at 38-39.  In that respect, the government proposes a reduction of 95% based on Hitkansut's receipt of 5% of the compensation it sought.  *Id.* at 38-39.

Hitkansut defends the rates sought by John S. Artz, arguing that he has charged his standard rate, which "represents the opportunity cost of what the firm turned away in order to take [Hitkansut's case]."  Pls.' Reply at 14.  Hitkansut accepts the AIPLA surveys and use of a localized rate, *see* Hr'g Tr. 20:14-24 (Feb. 15, 2019); PXs D-F (AIPLA surveys provided by

---

[18]PX R, a detailed itemization of attorney hours, shows 12,721.1 hours at $3,290,782.50.  PX R at A603.  The difference is attributable to eight employees not listed in PX H and an additional 43.3 hours among five attorneys that appears in PX R.  *Compare* PX H, *with* PX R at A601-03.  Hitkansut represents that the eight employees appearing in PX R and not PX H were omitted intentionally and affirms the $3,241,351.00 requested in its motion and supported by PX H, Hr'g Tr. 22:6-22 (Feb. 15, 2019), as corrected for minor typographical errors.  The government's objection to fees for these eight attorneys, *see* Def.'s Resp. at 24-26, 31-33, thus is moot.

[19]Mr. Smith was also billed at $115 to $120 per hour for the first 11 hours of Task 1 work.  *See* PX H at A042.

Hitkansut), and notes that John S. Artz's maximum rate is below the 90th percentile for partners in the applicable geographic area as reflected by the AIPLA surveys and that his credentials and experience merit a rate higher than the median. Pls.' Reply at 15; Hr'g Tr. 21:9-23 (Feb. 15, 2019). Hitkansut also argues that it achieved success by prevailing on the only infringement claim it asserted and rebutted the government's attempt to invalidate the patent. Pls.' Reply at 20.

The statute expressly permits recovery of "reasonable fees for . . . attorneys." 28 U.S.C. § 1498(a). The "most useful starting point . . . is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hubbard v. United States*, 480 F.3d 1327, 1332 (Fed. Cir. 2007) (quoting *Hensley*, 461 U.S. at 433). A reasonable rate is one "adequate to attract competent counsel" while avoiding "windfalls to attorneys." *Biery v. United States*, 818 F.3d 704, 710 (Fed. Cir. 2016) (quoting *Hensley*, 461 U.S. at 444). Reasonable attorneys' fees for all stages of the litigation are recoverable. *E.g.*, *Jean*, 496 U.S. at 156, 161-62 ("[A] fee award presumptively encompasses all aspects of the civil action."). With these starting points, the court "must then consider [several factors regarding] whether to increase or decrease the fee, of which 'the most critical factor is the degree of success obtained.'" *Hubbard*, 480 F.3d at 1332 (quoting *Hensley*, 461 U.S. at 436). The court has applied these standards to fee-shifting provisions of the Civil Rights Act, EAJA, and the Uniform Relocation Act, *e.g.*, *id.* F.3d at 1333 (discussing the Civil Rights Act and EAJA); *Biery*, 818 F.3d at 712 (Uniform Relocation Act); *Lost Tree*, 135 Fed. Cl. at 96 (Uniform Relocation Act), and thus finds that this approach should apply to fees sought under 28 U.S.C.§ 1498(a) as well.

As previously discussed, the court finds Hitkansut's highly detailed itemization of attorney hours and tasks sufficient to support the hours expended. Regarding a reasonable hourly rate, the court concurs with the parties that the AIPLA surveys provide an appropriate starting point for hourly rates and that the "Other Central" category, which encompasses Detroit, Michigan, is the appropriate reference point. *See, e.g.*, PX E at A025 (defining the "Other Central" area).[20] Litigation of intellectual property is sufficiently specialized to justify using rates applicable to that specific field. Between 2012 and 2016, during which the greater part of the litigation occurred, the average hourly billing rates for partners in the intellectual property field in the "Other Central" area ranged from $376 (in 2012) to $398 (in 2016). *See* PXs D-F. Median rates ranged from $355 (in 2012) to $378 (in 2016) while rates for the third quartile ranged from $440 (in 2012) to $458 (in 2014). *See* PXs D-F. Mean and median associate rates ranged from $254 to $283 (mean) and $243 to $260 (median) during the same period. *See* PXs D-F.

The court finds that an hourly rate up to $458 reflecting the third quartile, is reasonable for John S. Artz, given his patent litigation experience. *See* PX A. He is the only partner whose

---

[20]The Federal Circuit has recognized that where attorneys perform the majority of their work outside of Washington, D.C., local rates may be appropriate. *See, e.g.*, *Biery*, 818 F.3d at 712-14 (affirming use of St. Louis rates when awarding attorneys' fees for attorneys who worked primarily in St. Louis, in a case under the Uniform Relocation Act); *Avera v. Secretary of Health & Human Servs.*, 515 F.3d 1343, 1349-50 (Fed. Cir. 2008) (allowing, but not mandating, use of a local rate in a case under the Vaccine Act).

hourly rate exceeds the mean rate urged by the government. The court further finds that the median rate for associates of $260 is reasonable, given the patent litigation experience attained by Franklin Smith, *see* PX C, the only associate whose hourly rate exceeds the median rate. These rates appear appropriate to attract counsel competent to handle highly-technical patent litigation against the resources of the federal government, especially considering that fewer than 10% of attorney hours exceeded these caps, and then only slightly.

Hitkansut may recover reasonable fees for paralegals at prevailing market rates if sufficiently documented. *Dalles Irrigation Dist.*, 91 Fed. Cl. at 708 (citing *Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571 (2008)). Hitkansut has provided detailed invoices for its paralegals, "specialists," and an "intellectual property intern" (collectively, "legal support staff"). *See* PXs H, R. Hourly rates ranged from $150 to $215 over 545.7 hours, totaling $87,113. *See* PXs H, R. As with attorneys, rates prevailing in the community should apply. Hitkansut, however, has not provided prevailing local market rates for its legal support staff as it has for attorneys. Some legal support staff were billed at rates slightly below associates, and those rates appear to align with rates for Washington, D.C. rather than Detroit. *See, e.g.*, *Campbell v. United States*, 138 Fed. Cl. 65, 74-78 (2018) (showing rates for paralegals claimed at $210 per hour, though noting that the Laffey Matrix and Kavanaugh Matrix suggested rates between $154 to $187 for 2013 to 2017).

Because the work and hours of the legal support staff appear reasonable, the court rejects the government's argument that Hitkansut's failure to justify a rate requires denial of an award. Rather, the rates requested can be adjusted to ensure that a reasonable rate prevails. Recently, the District Court for the Eastern District of Michigan has found hourly rates for paralegal services up to $100 to be reasonable in EAJA cases, though these matters often involved social security claims and attorneys outside of Detroit. *See Brusch v. Colvin*, No. 15-13972, 2017 WL 1279228, at *3 (E.D. Mich. Apr. 6, 2017) ($100 for a Chicago paralegal); *Rheen v. Commissioner of Social Security*, No. 14-11124, 2016 WL 3135762 (E.D. Mich. Apr. 21, 2016) ($75 for a Michigan paralegal). This court has found rates ranging between $150 and $190 per hour to be reasonable for the applicable period for the St. Louis market in Uniform Relocation Act cases, *e.g.*, *Whispell Foreign Cars, Inc. v. United States*, 139 Fed. Cl. 386, 400-01 (2018) ($150 for 2015-16); *Campbell*, 138 Fed. Cl. at 75 ($175 to $190); *Bratcher v. United States*, 136 Fed. Cl. 786, 800 (2018) ($150 for 2015-16); *Greenwood v. United States*, 131 Fed. Cl. 231, 241 (2017) ($150 to $175 for paralegal work performed after 2011), and the AIPLA places St. Louis and Detroit into comparable metropolitan areas, *e.g.*, PX F at A032. The Laffey Matrix prepared by the United States Attorney's Office for the District of Columbia suggests hourly paralegal compensatory rates of $154 to $164 for D.C.-based work between 2015 and 2018, while the alternate Kavanaugh Matrix suggests rates between $175 and $187.[21] Based on the lower cost of legal services in Detroit than Washington, as reflected by the AIPLA surveys, and taking into

---

[21]The Laffey Matrix is available at https://www.justice.gov/usao-dc/file/796471/download. The Kavanaugh Matrix adjusts the Laffey Matrix based on changes to the Legal Services Index of the Consumer Price Index. *Biery*, 818 F.3d at 713. The Court of Appeals for the Federal Circuit has affirmed fee awards using either matrix as part of the court's discretion, so long as the court "consider[s] all the relevant facts are circumstances" and justifies its award decision. *Id.* at 714.

account approved rates in St. Louis, which falls in the same geographic region as Detroit per the AIPLA surveys, the court adopts $150 as a reasonable rate for services of Hitkansut's legal support staff.

Of the $1,894,511.00 requested for pre-trial activities (Category 1), attorneys' fees incurred before Hitkansut filed its complaint in this court amounted to $75,831.00. *See* PX R at A394-401.[22] The court finds that these fees are not reasonably related to the case in this court. The pertinent time was expended in pursuing two failed suits, one in the District Court for the Eastern District of Michigan and the other in this court filed when the case in the Eastern District of Michigan remained pending. *See Hitkansut LLC, et al. v. UT Battelle LLC*, No. 2:11-cv-15598 (E.D. Mich. 2011); *Hitkansut LLC, et al., v. United States*, No. 12-163 (Fed. Cl. 2012). Both actions were voluntarily dismissed because jurisdiction was lacking. *See* Def.'s Resp. at 35.

Of the remaining Category 1 fees, 141.4 partner hours, 7.1 associate hours, and 160.2 legal support staff hours exceed the hourly lodestar rates, and accordingly must be reduced by $6,703.80 in fees. Of the $1,015,709.00 requested for trial preparation, trial, and post-trial activities (Category 2), 377.8 partner hours, 48.1 associate hours, and 385.5 legal support staff hours exceed the hourly lodestar rates, and must be reduced by $14,648.10 in fees. Of the $331,131.00 requested for appellate activities (Category 3), 136.8 partner hours and 306.6 associate hours exceed the hourly lodestar rates, and must be reduced by $13,803.10 in fees.[23]

Examining whether to reduce the award based on the measure of success, the "mechanical mathematical analysis" proposed by the government to reduce fees by 95% "is inconsistent with the nuanced approach" the trial court should take. *Hubbard*, 480 F.3d at 1334 (rejecting the government's argument that fees and costs awarded should be 0.06% of those requested when damages awarded were 0.06% of those sought); *see also Hubbard v. United States*, 80 Fed. Cl. 282 (2008) (awarding, on remand, approximately $90,000 in fees and costs where $400 in damages were awarded), *aff'd*, 315 Fed. Appx. 307 (Fed. Cir. 2009) (per curiam). In this instance also, the compensation awarded warrants no reduction of the award. Hitkansut brought and succeeded on its only claim, that of infringement of the '722 patent, and successfully defended the validity of its patent against the government's challenges. Though Hitkansut only prevailed on three of seven asserted claims of the patent, there is a difference between use of "claim" in the context of the litigation and the patent. Infringement of three claims of the patent results in the same legal outcome as infringement of one or seven claims.

---

[22]This amount excludes time of seven attorneys and an IP specialist for whom fees are not requested. *See* PX R at A391-A401; Hr'g Tr. 22:6-22 (Feb. 15, 2019).

[23]The court is cognizant that it may not award interest without express statutory permission. *E.g.*, *Hubbard*, 480 F.3d at 1334. No such permission exists under 28 U.S.C. § 1498(a). But because Hitkansut requests hourly rates generally below the lodestars deemed applicable by the court for attorneys and the court adopts an hourly rate for legal support staff at the low end of the common range, it is unnecessary to identify distinct rates for each year of litigation to avoid running afoul of the no-interest rule.

The government did successfully argue that Oak Ridge's research funding could not give rise to royalties, effectively reducing Hitkansut's award by 95%. But this dispute did not represent 95% of the case. Rather, infringement represented the primary issue. The status of research funding represented a subset of the damages aspect of the infringement claim. Arguments focused on the status of research funding did not present a distinct claim nor was the issue sufficiently significant to warrant identifying and eliminating costs associated with that subset. *See Hensley*, 461 U.S. at 440 ("Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claim, the hours spent on the unsuccessful claim should be excluded."); *Biery*, 818 F.3d at 712 ("When multiple claims are brought in a single litigation and involve common questions of law, it may be difficult, if not impossible, to separate out the hours expended on each claim . . . . [But a] fee award is subject to a court's discretion and a court '*may* attempt to identify specific hours that should be eliminated, or it *may* simply reduce the award to account for the limited success.'") (quoting *Hensley*, 461 U.S. at 436-37) (emphasis added). Further, success or failure on the multiple procedural issues are subsumed into the overall outcome of the case. *Cf. Hensley,* 461 U.S. at 440 ("Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised."). Here, Hitkansut obtained more than nominal compensation. The up-front licensing fee of $200,000 that was awarded considerably exceeds what would be deemed nominal damages, even in a patent litigation. *Compare id.* at 432-36 (taking degree of success into account along with a range of other factors to determine a reasonable fee), *with Farrar v. Hobby*, 506 U.S. 103, 115 (1992) (ruling on a reasonable fee when "a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief").

Additionally, the court rejects the government's argument that the appeals court is the proper court to determine attorneys' fees for the appeal. Def.'s Mot. 37 (arguing that the appeals court "is the appropriate court to determine whether the position of the United States was 'substantially justified' or whether 'special circumstances make an award unjust'") (citation omitted). The Supreme Court implicitly rejected this position in *Jean*. The appeals court does not make a separate determination regarding substantial justification. "[A] fee award presumptively encompasses all aspects of the civil action," "favors treating a case as an inclusive whole," and "only one threshold determination [of substantial justification] for the entire civil action is to be made." *Jean*, 496 U.S. at 159-62. And, "it is appropriate to allow the [trial] court discretion to determine the amount of the fee award, given its 'superior understanding of the litigation . . . .'" *Jean*, 496 U.S. at 161 (quoting *Hensley*, 461 U.S. at 437). While "[n]o costs were taxed in [the] appeal," Notice of Entry of Judgment Without Opinion (May 9, 2018), ECF No. 239, taxable costs do not encompass attorneys' fees. *See* 28 U.S.C. § 1920(1); *see also* Fed. Cir. R. 39 (Practice Notes). Thus, the Federal Circuit's judgment of affirmance does not preclude award of attorneys' fees incurred during appeal.

Accordingly, the court awards $3,130,365.00 in attorneys' fees to Hitkansut, representing $1,811,976.20 for pre-trial work (Category 1), $1,001,060.90 for trial preparation, trial, and post-trial work (Category 2), $317,327.90 for appellate work (Category 3), and $0.00 for post-appellate work (Category 4).

3. *Expert witness expenses.*

Hitkansut requests $823,196.92 for the expenses of three experts, Dr. Cahill, Dr. Wagoner, and Mr. Epps. *See* PX I at A048; PXs J-L. Hitkansut provided itemized invoices for services rendered by each, PXs J-L, and has already paid these experts for their services, *see* PX N. The government has not raised specific objections to the request for expert fees.

Hitkansut employed Dr. Cahill from September 2013 through August 2014 to assist pre-trial with technical aspects of the patent. Pls.' Mot. at 14; PX J. Dr. Cahill was a department head and the Donald B. Willett Professor of Engineering, Professor of Materials Science and Engineering at the University of Illinois at Urbana-Champaign. *Hitkansut v. United States*, 115 Fed. Cl. 719, 722 n.5 (2014). Dr. Cahill billed $28,584.94 for consulting services at $495 per hour, actual travel expenses, and travel time at $247.50 per hour. *See* PXs I, J.

Hitkansut employed Dr. Wagoner from August 2014 through September 2017 to assist during all litigation stages with technical aspects of the patent, to include testifying as Hitkansut's technical expert during trial. *See* PX K; *see also, e.g.*, *Hitkansut*, 130 Fed. Cl. at 372 & nn.18, 19. Dr. Wagoner was a professor emeritus of materials science and engineering at the Ohio State University, and had been chair of the materials science and engineering department. *Hitkansut*, 130 Fed. Cl. at 372 n.19. Dr. Wagoner billed $539,755.42 for consulting services at $450 per hour and for actual travel expenses. *See* PXs I, K.

Hitkansut employed Mr. Epps of Epps Forensic Consulting PLLC to consult on damages from May 2015 through September 2016. *See* PX L. Mr. Epps has a bachelor's degree in business and accounting from California State University and a master's degree in education from the University of Phoenix. *Hitkansut*, 130 Fed. Cl. at 391-92 & n.31. He was accepted as an expert in forensic accounting and testified at trial regarding damages. *Id.* Epps Forensic Consulting billed $254,856.56 for consulting services provided by eight employees at rates ranging from $155 to $425 and for actual travel expenses. PXs I, L.

"Reasonable and entire compensation . . . includ[es] reasonable fees for expert witnesses." 28 U.S.C. § 1498(a). The court finds the expert fees to be reasonable, considering they were incurred in arm's length transactions, *cf. Lost Tree*, 135 Fed. Cl. at 96 (citing *Florida Rock Indus., Inc. v. United States*, 9 Cl. Ct. 285, 290 (1985)) ("Fees incurred and paid by a client at an agreed rate are presumptively reasonable."), and given the qualifications and purpose of the experts.[24] Dr. Wagoner, Hitkansut's primary expert witness who incurred two-thirds of the expert expenses, had strong credentials and was crucial to Hitkansut's case. "[R]easonable costs . . . in pursuing the action" includes costs incurred during all stages of the litigation through the submission of the request for attorneys' fees and costs, *see Jean*, 496 U.S. at 161-62, and thus encompasses the cost of experts during the appellate process as well.

---

[24]Unlike EAJA, 28 U.S.C. § 1498(a) neither contains an express term limiting expert compensation nor uses a term regarding expert compensation that would counsel that any limitation should be imported from EAJA. *Compare* 28 U.S.C. § 1498(a), *with id.* § 2412. Correlatively, the Uniform Relocation Act permits reimbursement of "reasonable . . . appraisal, and engineering fees, actually incurred." 42 U.S.C. § 4654(c).

No costs were taxed in the appeal, and the court has carefully avoided inclusion of any such costs at this post-appeal stage. Many of the statutorily taxable costs are inapplicable to appeals because they relate to trial proceedings, such as "fees and disbursements for . . . witnesses." *See* 28 U.S.C. § 1920(1); *see also* Fed. Cir. R. 39 (Practice Notes). Taxable witness fees are further defined to cover attendance at trial and attendant travel time, meals, and the actual transportation expense. *See* 28 U.S.C. § 1821. None of the expert witness fees incurred by Hitkansut during appeal fall into those categories, *see, e.g.,* PX J at A153, A156, and thus are not precluded from award.

Accordingly, the court awards $823,196.92 in expert fees, representing $412,405.89 for pre-trial work (Category 1), $390,451.03 for trial preparation, trial, and post-trial work (Category 2), and $20,340.00 for work during the appellate stage (Category 3).

4. *Other (non-expert) expenses & costs.*

Hitkansut claims $442,497.04 in expenses exclusive of expert witnesses through August 3, 2018, divided into "hard" and "soft" expenses. Hard expenses totaling $210,587.27 were those "paid by the firm," while soft expenses totaling $231,909.77 were those "incurred by the firm but not paid out." PX N; Artz. Decl. ¶ 6.[25] Hard expenses reflect $53,891.99, $132,028.67, and $24,666.61 incurred in Categories 1 through 3, respectively. *See* PX M.[26] Hard expenses include, among other things, travel costs, court fees, delivery services, transcripts and certified copies of official records, and third-party document reproduction services. PX N at A206-17. Soft expenses reflect $92,077.96, $82,167.51, and $57,644.30 in Categories 1 through 3, respectively. *See* PX M. Soft expenses include, among other things, internal reproduction of documents, computerized legal research, telephone charges, and data hosting. PX N at A218-A320. The court adopts $442,497.04 as the starting point for expenses through August 3, 2018.

The government argues that $817.73 in expenses predate the complaint in this court and must be excised because they were not incurred in pursuit of this case. Def.'s Mot. at 36. The government also contends that expenses from appeal are not permitted because costs were not taxed on appeal. *Id.* at 37.

Hitkansut's expenses are awardable if reasonably related to the case and not otherwise barred. *See* 28 U.S.C. § 1498(a). Hitkansut incurred expenses totaling $3,554.98 prior to commencing litigation in this court, such as filing fees in another court, and those pre-suit

---

[25]Hitkansut's itemization of soft costs totals $235,167.77 from December 2, 2011, through September 30, 2018, *see* PX N at A320. Hitkansut's request of $231,909.77, however, omits expenses for August and September 2018 that appear on the invoice.

[26]Hitkansut's invoice of hard expenses reflects $28,415 more than requested between Categories 1 and 2. *Compare* PX M at A204 (summary showing $210,587.27), *with* PX N at A217 (invoice showing $239,003.17 after $823,196.92 in expert expenses is removed from the total of $1,062,200.09). Since the discrepancy is neither explained nor readily apparent, the court adopts the lower number as requested by Hitkansut.

expenses are not reasonably related to the litigation.[27]   Further, no costs were taxed in the appeal. Hitkansut incurred expenses totaling $4,614.55 on appeal that are not assignable per the Federal Circuit's judgment.   *See* 28 U.S.C. § 1920(1)-(5); *see also* Fed. Cir. R. 39 (Practice Notes). Other expenses are not covered by the definition of "cost" for the purpose of whether they are taxable, and thus are not subject to the Federal Circuit's decision.

Among non-expert hard expenses are costs associated with attorney travel, including transportation, lodging, and meals.   The court finds these compensable under 28 U.S.C. § 1498(a) if supported by sufficient documentation and reasonably related.   *See, e.g.*, *Dalles Irrigation Dist.*, 91 Fed. Cl. at 710 (finding attorney travel compensable under EAJA). Hitkansut's itemized expenses suffice.   *See* PX R.

Accordingly, the court awards $434,327.62 in non-expert expenses and costs, consisting of $142,414.97 in pre-trial expenses (Category 1), $214,196.18 in trial preparation, trial, and post-trial expenses (Category 2), $77,716.45 in expenses during the appeal process (Category 3), and $0.00 in post-appellate expenses.

5.   *General reasonableness & special circumstances.*

Lastly, the government argues that Hitkansut's request must be reduced because it is unreasonable for costs to exceed the value of the claim.   Def.'s Mot. at 37-40.   Essentially, the government seeks to cap any award at $200,000 plus interest from February 2007.   *Id.* at 40. Hitkansut avers that no case law supports this proposition, Pls.' Reply at 20, and that value lies in vindication of its ownership rights, its reputation, and the patent's validity, *see* Hr'g Tr. at 67:5-23 (Feb. 15, 2019).

The court recognizes that an award of attorney fees and costs of several million dollars is significant.   Hitkansut's claim, however, was vigorously contested by the government, involved highly-technical subject matter, spanned six years, and proceeded through a lengthy appeal. Hitkansut also faced an opponent with vast resources whose calculus regarding settlement and the value of precedent differs from that of a private litigant.

The fee shifting provision contains no explicit cap on the owner's reasonable costs. Instead, it provides that "[r]easonable and entire compensation shall include the owner's reasonable costs, including reasonable fees for expert witnesses and attorneys, in pursuing the action."   28 U.S.C. § 1498(a).   The government reads an unstated cap into the statute through the term "reasonable."   As the government sees it, it is unreasonable to spend millions to obtain a judgment of $200,000 plus interest.   *See* Def.'s Mot. at 39.

Precedent uniformly contravenes the government use of "reasonable" in the context of a fee-shifting statute.   Under both the Uniform Relocation Act and EAJA, it is not uncommon for awarded attorneys' fees and costs to exceed damages.   *E.g.*, *Biery*, 818 F.3d 704 (affirming award under the Uniform Relocation Act of more than $700,000 in fees and costs on damages of

---

[27]Ineligible expenses include the $817.73 in hard costs challenged by the government and an additional $2,737.25 in soft costs.   PX N at A218.

$270,000), *aff'g*, No. 07-693L, 2014 WL 12540517 (Fed. Cl. Jan. 24, 2014); *Hubbard*, 80 Fed. Cl. 282 (awarding $90,000 in fees and costs under EAJA for on damages of $400), *aff'd*, 315 Fed. Appx. 307 (per curiam); *see also Dalles Irrigation Dist.*, 91 Fed. Cl. 689 (awarding $210,000 in fees and costs under EAJA where $173,000 was awarded in damages); *Shelden*, 41 Fed. Cl. 347 (awarding $600,000 in fees and costs under the Uniform Relocation Act where $200,000 was awarded in damages). Fee awards exceeding damages occur despite EAJA's explicit caps on hourly rates for experts and attorneys. 28 U.S.C. § 2412(d)(2). But these caps do not preclude fees and expenses from exceeding damages because EAJA imposes a ceiling on hourly rates, not a ceiling on total compensation. Awards under the Uniform Relocation Act, a takings statute like 28 U.S.C. § 1498(a), omit any caps. *See* 42 U.S.C. § 4654(c). Accordingly, "reasonable" in this context examines whether costs were necessary to the litigation and incurred at prevailing market rates, and not whether costs would have made litigation unprofitable in the absence of a fee-shifting provision.

Accepting the government's argument would contravene the statutory purpose. Fee-shifting provisions like 28 U.S.C. § 1498(a) exist precisely to accommodate suits where the cost to bring the suit could not be recovered from the damages awarded, *i.e.*, suits where a meritorious plaintiff could not afford to bring the suit because the damages recoverable, however real, are insufficient to attract attorneys. *See* H.R. Rep. No. 104-373, at 1, 6-7, 1996 U.S.C.C.A.N. at 4173, 4178-9 ("The purpose of [the amendment] is to help *small business, independent inventors and nonprofit organizations* recover the legal costs associated with defending their patents when the Federal government is found liable for taking and using them.") (emphasis added); *see also* H.R. Rep. No. 96-1418, at 1, 12, 1980 U.S.C.C.A.N. 4984, 4984, 4991 (identifying EAJA's purpose as "reduc[ing] the deterrents and disparity" that arise "because of the expense involved in securing the vindication of their rights [against the government]," and finding that "[w]hen there is an opportunity to recover costs, a party does not have to choose between acquiescing to an unreasonable government order or prevailing to his financial detriment"). "The [g]overnment's general interest in protecting the federal fisc is subordinate to the specific statutory goals of encouraging private parties to vindicate their rights and 'curbing excessive regulation and the unreasonable exercise of [g]overnment authority.'" *Jean*, 496 U.S. at 163-65 (citation omitted). Forcing a potentially meritorious patent owner to choose between surrender and a Pyrrhic victory creates precisely the Catch-22 situation that Congress and courts have specifically rejected under other fee-shifting statutes.

Finally, the government's analysis of reasonableness rests on several improper assumptions. The government emphasizes the final results, not the potential value at the time Hitkansut made its litigation decisions. Hitkansut may have recovered only $200,000 plus interest, but sought up to $5.6 million based on the research-funding issue of first impression. What matters for rationality is Hitkansut's potential value: its possible recovery multiplied by the probability of success, perhaps adjusted for aversion to risk, and less anticipated legal costs. *See, e.g.*, Steven Shavell, *Suit, Settlement, & Trial: A Theoretical Analysis Under Alternative Methods for the Allocation of Legal Costs*, 11 J. Legal Stud. 55, 56-59 (1982).[28]

---

[28]A similar question, if it were based on valid assumptions, could be asked of the government, which likely spent far more than $200,000 to defend this case.

This simple proposition is further complicated here by several considerations not addressed by the government.  The odds of success are difficult to calculate for an issue of first impression.  Prior expenditures that cannot be recovered, *i.e.*, sunk costs, should be given no consideration in whether to proceed with further costs to obtain the expected result.  Litigation proceeds in discrete stages: pre-complaint investigation, complaint, initial discovery, extended discovery, expert discovery, pre-trial motions to dismiss or for judgment, trial, post-trial motions, appeal.  Each stage imposes discrete costs, could change the expected value, results in previous costs being sunk, and thus requires a new decision at every stage whether to proceed by assuming whether future costs are likely to exceed the expected value.[29]  An additional point of complexity arises from fee-shifting provisions like 28 U.S.C. § 1498(a).  In such cases, litigation costs may not actually be sunk, and thus must, like the expected recovery, also be adjusted for the probability of success.  *See, e.g.*, Shavell, *supra*, at 60.  Irrespective of an economic analysis, 28 U.S.C. § 1498(a), like other fee-shifting statutes, contemplates awards of attorneys' fees and costs in excess of damages precisely to allow vindication of rights by those with limited means.

## CONCLUSION

For the foregoing reasons, Hitkansut's motion for attorneys' fees and costs under 28 U.S.C. § 1498(a) is GRANTED in part and DENIED in part.  Hitkansut is awarded attorneys' fees and costs as delineated above.  The clerk shall enter final judgment for Hitkansut for the total amount of $4,387,889.54.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge

---

[29]It is rational for a plaintiff to spend more than the expected value of the case so long as any cost in proceeding is below the expected value.  For example, assuming undisputed damages of $100,000 and liability as the only issue, if a plaintiff believed it had a 50% chance of winning, the expected value of the case is $50,000.  Therefore, it would be rational to spend up to $50,000 in litigation costs.

Assume the hypothetical plaintiff succeeds at trial at a cost of $35,000.  Defendant appeals.  Plaintiff assesses chances of prevailing on appeal at 75%.  The expected value is now $75,000 at this stage.  It would be rational to litigate further so long as litigation costs in this round are below $75,000.  Thus, plaintiff may spend $110,000 to recover $100,000; $35,000 from the first trial and $75,000 from the second.  Of course, an astute plaintiff can consider the total probability of success from the outset, which combine to a 37.5% overall success rate, but could still end up spending more than the ultimate recovery.

.